Good morning. Good morning, Your Honor. May it please the Court? Can you keep your voice up? Yes, Your Honor. My name is Frederick H. Nelson, representing Rosenbaum, the appellants in this action. Your Honor, what I'd like to go right to the matter of, first of all, is to discuss with you what we believe is the course and practice in this regard of enforcement of these complaints called against these plaintiffs. What we really deal with here more than anything else, Your Honor, I think the most salient point in this case is the discretion that is afforded to these officers as they enforce or not enforce what they claim to be sound violations. Here is something that has never happened to any other person out in any of these venues. None of them have ever been arrested or cited the way the plaintiffs have. The way the plaintiffs have been taken to jail, incarcerated, strip searched, had their equipment confiscated for more than a year on occasion, and no one else has to suffer that. In fact, it's interesting the response Okay, one thing on this. When you're in the discussion, I want to make sure you keep the things that are in the record. Yes, Your Honor. Okay. Because that's what we have to deal with, the record here. I understand, Your Honor. And this is in the record that our clients have been arrested and cited, and their equipment has been confiscated for years. So I'm pointing out things that have happened to our people. And the city has not taken the same kind of action against anyone else. Why is that? It poses the question, what is going on with these people that I represent that is so different from those other groups out there? And that is, as we saw in the prior panel noted, there is evidence, and the prior panel noted this, if this evidence would be put in at a trial, and these plaintiffs brought forth these matters that I'm explaining to you and what we brought forth in our briefs, then we would have shown a violation. That's what the prior panel noted. Well, the prior case was on summary judgment, right? And so the prior panel said that there were triable issues, and now we're reviewing the trial, right? Yes, Your Honor. Okay. And what I'm mainly alluding to is this. The prior panel said these words. The plaintiffs have put forth evidence suggesting that the allegation, the difference in treatment is based upon the religious message that they espouse. This city has not addressed why these similarly situated groups would have been treated differently. And even at the trial, they didn't do that. Okay, but we need to deal with the trial. Because whatever was said at the summary judgment, which was what allowed you to go to trial, now we're reviewing the trial, and you're saying, so it's important. I think that the judge made some factual findings against you saying you hadn't proved that they were treated differently. Is that correct? I think what the judge below did was make those factual findings, but negating evidence that should have been looked at also. And that is part of our appellate argument here. What we're trying to express in this court – But isn't the – counsel, isn't the trier of fact free to credit evidence from some witnesses and not credit evidence from others? So if the judge made a finding of fact, aren't we reviewing that just for whether it's clearly erroneous? Your Honor, yes, that would be the standard of that review of the trier of fact. You're absolutely correct. But what we're trying to point out to the court is that the judge got it wrong on this point of discretion. And let me point out one thing that the judge didn't even deal with properly. And that is this internal policy the city has on its interpretation and enforcement of the 415 statute. The city put forth in their record – it's, in fact, on page 30 of their brief – that they use two elements when they determine whether someone is in violation of 415. And they say this, was the person complaining unreasonable – was the sound unreasonable to that person? That's the first prong. And second, whether the person making the sound knew that they were too loud. Now I ask you, how is it possible for someone even with a permit to know whether or not they had the intent to violate 415 if we follow N. Ray Brown under such a standard? There's no decibel limitation. In fact, if someone had a permit to know. Now, I guess from the standpoint now – not to be argumentative, but there could be some sounds that would be so loud that, you know, whether they – it doesn't require actual knowledge. But whether – read me the words again. Whether – well, I guess whether they knew – but, I mean, some sounds could be so loud that a jury, you know, that a trier of fact could say, well, anyone would know that was loud. Right. And, in fact, when the city tries to point out in their defense some similar groups that may have been cited under 415, they make an example of someone who just was beating on drum for hour on end without really communicating a message. But if we follow N. Ray Brown, which the defendants say we should, and then they use this as their policy that the person that's hearing the sound say – just says, it's unreasonable to me. And then the second prong of that test that they say is their policy in applying 415 is the person making the sound knows that they're too loud. How can anyone even get within their own framework? How could I self-regulate myself and my sound to know whether or not I'm too loud? In fact, what they say is that at one time they came back – the police came back and they said, well, now the sound was louder, but it may not have been louder only because they were turning up wattage or turning up volume, but because someone was making a point as they do when they're preaching. I'm louder now than I was a moment ago, not because the clerk turned the volume up on this microphone, but because I'm trying to emphasize a point. And here we have the dilemma, Your Honor. There's nothing objective there. And that's our greatest concern. As a civil libertarian, Your Honor, I represent many governments across the country. I write these ordinances. I write these policies. And one thing I try to emphasize over and over again when I'm representing government is this. You must not leave the discretion to the officer in the street, because we then have such difficulty as a court and as attorneys to try to figure out what was in the mind of that person, which is why the panel said previously you cannot try to rely upon the officer's intent. And that is truly where the judge below went wrong. Trying to say to these people proving their case at trial that they had to prove the intent, discriminatory intent, even though the prior panel said they did not have to do that, that creates a dilemma. Because there's no, there is no. That's basically the end. Counsel, you keep going back to the prior disposition. But again, as Judge Callahan noted, that was on summary judgment and all inferences were being given to your clients. And at this point, we really are dealing with the record that was before the trial court, what that evidence was, you know, and what the trial court's conclusions of law and findings of fact were. And so I would suggest you stay focused on that as opposed to what you think the prior panel held. And I anticipated that question from Your Honor, and I would point out this response. The evidence that they said that they would rely on in the prior panel was put into the trial record. So there's no we can review whether it's there or whether it was proper. Exactly, Your Honor. That's fine. And I think the suggestion twice now is that you forget what the prior panel did. Let's talk about what the district court did. Right. And let me make clear, I'm not trying to forget that it was a summary judgment standard there. But what I'm saying is the prior panel said, if we let this evidence in, if we consider this evidence that is on summary judgment here, and if that was evidence that was brought into the trial, we would find a violation, is what they said. And so I'm not saying that you're in any manner. Again, they're saying this, giving all inferences to your client, which isn't the way it necessarily is when the evidence comes in at trial. So, I mean, you can argue however you want. But as far as I'm concerned, it's going to be more meaningful to me if you'll talk about the actual evidence that was presented and the findings that were made or any finding that wasn't made. But I don't really I've read the prior opinion more than once or the prior memorandum disposition. And we can read that. We don't need to hear about that, really. Thank you, Your Honor. And I think it's not the best use of your time. Let me address this point about the the issue of how they enforce it. This is in the record. It was shown at trial. Well, I have a question based on the way you started your argument. Are you making a facial challenge to anything here? I believe all the challenges are really dealing with the enforcement aspect of these various provisions. You were saying about the PD said this is what the officers are supposed to look at. And you're saying I thought that that was an inadequate instruction to the officers. So it's kind of a facial challenge to the instruction to the officers? What it is, it's showing the way they enforce it is according to their own internal policy. It's found on page 30 of their brief. They explain those two prongs. So 415, it's not a facial challenge to 415 itself. It's saying that the way they're enforcing 415 by their own internal policy is infirm. And it must be infirm. Let me point out something about that and what was in the trial record. This is their admission that that's how they do it. You could be cited and hauled off to jail under 415 whether you had a permit or not under their policy, under that internal policy you find on page 30 of their brief. Because even if you had the permit to be at a certain decibel level at a certain time of day at a certain zone of venue, wherever you were, if one, prong of their internal policy, the person complaining says it's unreasonable to them, and two, if you somehow know the officer has to do this, the officer has to say, I know that they know that they're too loud. That's their policy. There's no objectivity at all there, Your Honor. And that's the harm here. That's what I think. Isn't that a screen, though? In other words, it's an instruction to the officer, you need to do a couple of things here before you take the next step. You're exactly right, Your Honor. And I would ask that there be a screen. I would hope there would be a screen. I would recommend a screen. One of the things I would hope that an officer looks at in any circumstance is how reasonable is the complainant. And if the complainant is a drunk lying in the gutter saying that, you know, I got so worried about the sound I dropped my beer, the officer isn't going to go any further. So looking at how reasonable the complainant is is certainly a place to start. Isn't that right? It would be, yes, Your Honor. And I agree with you. I think there should be a screen. Your Honor, you're totally right. But how about a screen differently that's more objective that says, well, you've got a permit here to be at this certain decibel level that's been reviewed. We know that this zone gives that. But under their analysis, their internal policy of how they apply 415, it wouldn't even matter if you had a permit to be at 70 decibels because the way those two prongs would operate have nothing to do with any objective criteria such as decibel level. Well, except if you had a permit and you were out there and said you could be at 70 decibels and somehow the officer thought you were at 70 decibels, then that would be something that would be considered in those questions. Because when what we're talking about is the officer is supposed to know whether the person would know they were in violation. Well, if someone whips out a permit to do exactly what they're doing, I think that there's a good argument that the officer would say, well, how would you know you're doing anything wrong? And that is exactly what happened in our case, but it was in converse, Your Honor. Well, but we don't have the – but there isn't a – on the 415s that we're reviewing here, you don't – there isn't a 415 here where someone whipped out a permit and arrested them, right? That's correct. But that's my point, is that it's not relevant to their analysis. You would think that it would be. Well, but I think it would be. In answering those questions, if someone pulled out a permit, I think it would be relevant and that a court could say you didn't have probable cause because the person showed you they had a permit to do exactly what they're doing. And still, even in this case, under both situations which are in the record for you to review, in one case, a court threw it out. In the other case, they just dropped the charges, you see? But I'm trying to make the most important point is this. It doesn't matter whether you have a permit or not under the way they have this internal policy because there's no standard there. I – what I'm pointing out, Your Honor, Judge Nelson, is this. Should it not be – Well, there is a standard. You're disagreeing with the standard. I'm saying that the standard doesn't have objectivity, Your Honor. Okay, but when I hear there is no standard, that means there's no standard and you just read to me two inquiries that they're supposed to go through. So you're saying that standard isn't adequate or it's not objective enough or any number, but it's a standard nevertheless. It is a standard. And in fact, 415 used to be applied without any standards, true, until a court in Enray Brown said you need to say this. You need to be able to show that the person had the intent to disturb someone. And I'm just saying that if you're going to have a standard, make it one that actually works instead of leaving it up to tossing it up in the air on the street and determine, well, I think that person thinks they're too loud. And even on the issue of the complaints, talking about outside of 415, let's talk about the complaints themselves and how they enforce it. The defendants don't argue that they do this on a complaint basis, yet how is it when you look at the California constitutional argument, which the court below we think didn't even touch on, how is it that you can say that this group here can be there and they are all right to be there because of the California constitution analysis, they don't interfere with the forum, but here this group is here and they get a complaint against them and somehow they are in violation of the California constitution. Two groups making the same amount of noise, making the same expressions of sound, trying to give a message which may be different, yet this group is compatible with the fora and this group is not. We're not trying to say that under the California constitution there aren't things that would interfere with the forum, but how is it possible, even when you look at the record that we were able to put forward in the trial, that this group can stay and this group cannot? Just the flip of a hat. How is it possible? Well, what findings did the district court make that were against you on the different groups? Because the district court, it seems to me, made some findings that you hadn't shown certain, that you hadn't shown discrimination between groups, right? What did the district court find exactly? The district court was narrowing that down to and then got to the block of whether we had shown discriminatory intent, you see, and that's where the NICE panel, this is just a matter of law of the case. They said we didn't have to prove discriminatory intent, but the district court said we did. Well, but there was also something, I think, in the order that said I don't find that you've had a discriminatory effect as well, and then talking about intent. You can't just pull out sentences of the order. We have to look at the whole order. Well, that's obviously your part of your de novo review. We did put in evidence that there were complaints. There was a business owner constantly complaining about one group that was out there, and then those people never had any activity at all of enforcement taken against them. Again, we're the only people ever that were arrested and cited under the noise violations. Only ones. We were the only ones that had our equipment confiscated for a year. And yet business owners complained about other groups, and this was in the trial record, and yet those were left there. That's something for you to look at, and I think that's what was important for you to understand as far as your de novo review. When you see other groups there, how is it they do not interfere with the forum, and somehow we do under the California constitutional analysis? And how is it possible that the judge could ‑‑ it got to the point, Your Honor, where it got so tight that you had to prove ‑‑ this was the standard for us. We had to show that we were there at exactly the same time another group was there, not ten minutes later. Even someone who took a break while they were doing their sound, they took a break for ten minutes and suddenly were cited during that break time, and then they came back and they continued with their sound. Your Honor, it's just impossible for us to prove anything of discriminatory effect or we must meet. It just can't be done. This is what we're really wanting for the court to understand more than anything else. These plaintiffs are people who have no vehicle to express a message. They're people of limited means, and that's why the Constitution is designed to provide these venues of opportunity. And given the fact that they admit that they enforce these regulations on a complaint-based manner, that by itself opens up the door to discretion, and then the burden goes to them. The burden goes to them, and the question I would ask this court is to ask them, what did you do? What did you prove to show that you did not discriminate? Because the policy by complaint-based enforcement fosters discrimination, it is then their burden to show that they had reason to not allow the discrimination to occur on the scene, on the street. That is their duty. And I ask you to pose that question to them. I see I'm very limited on my time here. Do you want to reserve the balance of your time? If I may, Your Honor. All right. Thank you. Good morning. May it please the Court. I'm Margaret Baumgartner. I represent the city and county of San Francisco in this matter. It is one of the police department's very unglamorous duties to respond to issues regarding noise throughout the city and county of San Francisco. It's one of the things that the police department has to do regularly, and it's something that is not necessarily an important aspect of policing in the city, but it does affect people's lives, and it's something that they have to do. The question raised in this case is whether the police department did so in an even-handed manner and without regard to the content of plaintiff's message. The district court said they did, and that was certainly not an error. First, I want to address the equal protection argument and this issue of comparison. As the Court is very aware, last time we were up here, we were on a summary judgment. We need to start the clock. At trial, we presented evidence that was not before the Court on the last time we were up here, and that evidence had to do with the general method, the general philosophy the police department takes with respect to enforcing noise ordinances. It had to do with how the police department has treated other small groups, either singing or speaking, using amplified sound without a permit within the city and county of San Francisco. And what the evidence showed during trial was that the police department, in almost all circumstances, leaves everyone alone, even though they are using an unpermitted amplifier, and that includes the plaintiffs. The plaintiffs, the testimony of trials, the plaintiffs are out there almost every Friday night for 10 years using an unpermitted amplifier, which is against the law, which is against the municipal code, and the police leave them alone. That's also the case with respect to almost all of these other small musical groups throughout the city and county of San Francisco. Basically, unless there's a problem with them, the police leave them alone. And that's what happened with plaintiffs. So, in fact, no one's complaining about that, though, when they're left alone. No one's complaining about when they're left alone. And again, that was literally hundreds of times throughout the time period this case was going on, hundreds of times. So plaintiffs are trying to focus on these very narrow and limited circumstances that were gone over in detail during the course of the trial and ignoring all of the evidence that, in fact, they were equally, as the district court put it, unmolested. They were out there without any police interaction whatsoever. And that is, in and of itself, evidence that there is no equal protection violation here. Again, the issue of the differing treatment is to raise an inference that there's some discriminatory reason for enforcing the law against the plaintiffs. And I think appellants arguing that they were required to show a discriminatory intent by taking a statement out of the district court's decision. And can you respond to that? They're taking a statement out of the Ninth Circuit prior opinion and also the district court opinion that they're required to show intent. The case law is very clear that in an equal protection analysis, which is what we're dealing with here in the comparison groups, in an equal protection analysis, it requires both discriminatory effect and discriminatory intent. And the law is very clear on that. And the only basis that they have for arguing that they're not required to show intent is in the context from the Ninth Circuit's prior opinion here on an issue related to summary judgment, as opposed to post-trial. Well, I thought when the court in the prior summary judgment opinion said the plaintiffs need not show actual intent to discriminate, they were talking about the First District. You don't just, the plaintiffs don't merely have to show intentional viewpoint discrimination. They could also show a lack of standards in enforcement because the court cited, I think, the city of Lakewood case on that point. Right. Wasn't, wasn't, isn't that what the statement about intent related to? I believe that was, although it was a little confusing because, in fact, that was not the issue on summary judgment or on, that was really before the Ninth Circuit before. The summary judgment motion was granted on the basis that they hadn't shown a pattern of practice of constitutional violations that would entitle them to relief. And so the opinion basically said, look, there's a lot of activity going on out there and we can't really tell at this point whether they, you know, there's a question of fact at this point, whether these two groups were treated equally and how that deals and how that affects the constitutional analysis was not entirely clear, in my opinion, in the prior opinion. But the point of the matter is, is that for an equal protection argument, which is where this comparison is coming in, it's very, the law is very clear that it needs them both. And if I can talk about the First Amendment issue for a moment. First of all, there is no lack of standard, as the court pointed out. 415, the testimony in this particular case about 415 was very clear that in the vast majority of cases, I mean, the standard in the police department is a police officer's piece cannot be disturbed, period. So the police officer can't just go out there and, you know, say to someone who's quietly mumbling to themselves on the street that they're bugging me, they're bugging me and I'm going to arrest you because you're bugging me. This is not like the loitering cases where there's just absolutely no standards. It's entirely up to the police department. And the way it works is that the police department doesn't do anything until they actually get a complaint from a citizen. That initiates police department action. It does not initiate necessarily an arrest or citation. What it initiates is an investigation. And the police department goes out there and it says, okay, does this sound like this is a problem? Let me go and talk to this person. And the police department is out there solving community problems. That's what they do. That's why they're out there on the streets. That's why there's beat officers and everything else in San Francisco. What's the significance of the probable cause findings in these 415s? What that does is it negates any inference that the reason for the arrest was to try and shut down the message. All right. If, is it required in the, does the law require to have probable cause that you have to warn someone before you cite them? There, there could potentially be circumstances when that's not the case. Um, but in every single circumstance that exists, uh, the evidence presented to the district court in every single circumstance here, that's what occurred. There was a warning and prior to the citation. Um, I can imagine that there would be situations again when that wasn't necessarily required, but in this particular case, that's true. And it's very important to note also that, and again, this, this only, because of this confusion, um, regarding the use of the term bullhorn, um, as applied to plaintiff's actual loudspeaker, there was some confusion earlier on about what it was that they were actually doing out there. But what, how the evidence came in at trial is that in every single case, every single case where the plaintiffs were out there, um, and were contested by the police department and they didn't have a permit, they were in violation of the law, independent of the level or, or the disturbing of the peace amount of noise that they were making. So again, this is a scenario. The police officers get a complaint that somebody's being too loud and disturbing their peace. The police department goes out there. They don't go out there in order to, they don't want to cite or arrest people. That's not their initial intent in going out there. Their intent in going out there is to solve this noise problem in whatever way they can solve the noise problem. And the evidence at trial showed that what they do is they go out there and say, hey, can you be a little quieter? And that on almost all circumstances resolves the problem. And that's true, even though plaintiffs are at that moment in time in violation of the law. So oftentimes the police department, as the evidence shows, sort of address the problem initially by saying, hey, do you have a, you know, addresses the actual clear violation that's going on. Do you have a permit? And again, the evidence was unclear of whether they did that in every single situation, but certainly they did that frequently. And again, it was a method that the police department used to resolve the problem. And it's only when the problem did not get resolved were on the number of occasions, the two occasions that are really at issue in this particular case, where the police department had to go further. And again, they don't go out there with the intent of enforcing any particular law, they go out there with the intent of investigating. And in each of the circumstances at issue in this case, the police department went out there, they saw that the plaintiffs were in violation of this, the requirement to have a permit, but nonetheless, they investigated, they attempted to resolve the problem by asking to shut it down. And only when the problem continued, did they take any further action. Your opponent said very emphatically on several occasions that these plaintiffs were arrested and cited and that others, that was not true of others. And I'm not sure how, where he was tying the argument, but would you like to give multiple phrased argument of his? There are, there was no evidence before the trial court about any other people using unpermitted loudspeakers out on the street who were actually arrested and cited, but there was also no evidence before the trial court of anybody else who was using an unpermitted loudspeaker, was admonished by the police department to stop and got louder. And the testimony here from the officers who actually cited these people way back in 1996 was that they went out there, they admonished them, they asked them to turn it down and these people got louder. So there's no comparison there with respect to that. There's, there's no other group that can be similarly situated to that because we don't have the evidence that there was any other group similarly situated to that. And again, the discretion of, of the police officers in this case is greatly controlled. They have to have probable cause in order to do that. And that's what it says on page 30 of our brief was that they have to have, they have to do an independent investigation to determine whether the noise is loud and unreasonable and whether there appears to be an intent to vex, harass, or annoy. And the district court went through a detailed factual analysis of the arrests that were primarily at issue in this case and made that finding and said, look, you know, we're not trying to say that we're treated differently because of our message, but in fact, the facts show, and we make a factual finding that the reason that for the arrest had nothing to do with the message or to, in order to treat them differently or because we're trying to shut down all Christian speech within the city and county of San Francisco, but rather because they were in violation of the law and the officers took reasonable action. There's also lots of evidence in the record about the fact that the city and all Christian messages or even plaintiffs in particular, there's officer Lauren or Lieutenant Lauren at the time testified about all the other permits that have been granted to other Christian groups that they speak regularly. And again, the overwhelming evidence was that the plaintiffs themselves spend hours and days and countless times out there and don't get shut down, even though almost all of the officers who did testify in trial know who they are. Have seen them before and see them regularly, but they leave them alone. I'd like to ask you a question about scope of conduct in terms of, I think that the, it's the appellant's position that I think that the 2001 disposition in Rosenbaum versus the city and county of San Francisco expanded the scope of You're saying that what's before us is between September 1995 and September 1996, I think, can you explain that to me? Yes. There was, again, last time we were up here, we were on summary judgment. And the, in that case, it was the city's burden to show that there was basically no possible way the plaintiffs could prove their claim. No matter what, basically, no matter what the scope was in this particular case, the city included, and our argument on the case was that one of the reasons they couldn't prove their claim is there was no pattern and practice of intentional constitutional deprivation that would entitle them to the only relief that they've requested, which is injunctive and declaratory relief. And so the city felt that it had to talk about the current state of circumstances in order to basically disprove that plaintiff was entitled to any of that case. When we went to trial, however, we got to deal with the actual scope of the pleadings. And we didn't, you know, the scope was narrowed, the scope was discussed. And at that point in time, it was the city's position and continues to be the city's position today that what really was at issue was that the evidence after the pattern and practice entitling them to relief. But in order to get relief at all, the fundamental touchstone on which they get relief is if they've proven a constitutional violation within the year period. And the district court addressed that and found that that was also the case. And again, the plaintiffs in this case weren't completely denied the right to challenge the post-complaint events. I mean, they've filed numerous other complaints throughout the time, which have, I believe, at this point, all been voluntarily dismissed. But there were that those the specifics of those particular instances of post-complaint, whether they were actual independent violations, is not at issue in this particular case. Your opponent opened with a discussion of the one of his opening things was the inadequacy of the police department's internal policy, which, again, was not tethered to anything much that I could tell. Would you like to respond at all to that comment? Again, what he was referring to is the method in which the police department, I believe what he was referring to was the method in which the police department applies 415 of the penal code. And he quoted page 30 of our brief. And and what he forgot or didn't explain in his his analysis is that the first thing is, again, as I stated, a member of the public has to complain that their noise is being disturbed. So, again, it's not within the entire discretion of the police officer to say my piece is being disturbed and you're being too loud. The second is, is that that the police then have to have probable cause to believe that the suspect knows that he or she is too loud but refuses to turn down the sound. And the next sentence is key. In that situation, the police have probable cause to believe that the speaker first maliciously and willfully created, and then this is the term from 415, loud and unreasonable noise in violation of Penal Code Section 415. It is not discretionless in any way, shape or form. Again, if the police department were just out arresting everybody because they didn't like their message, this provision would constantly violate it. And it's not. This is consistent evidence from all of the police officers who came in and testified about how it is that they deal with 415 problems. And this is how they do it. They do an independent investigation even after they get a complaint. So the internal policy is not the basis for going out and citing or arresting anyone. In other words, there has to be more. Right. There has to be an actual violation that the officer observes and can cite on or arrest on. Unless the panel has any other questions, I would simply request that the panel affirm the decision of the district court and find for the defendant in this matter. There don't appear to be further questions. Thank you for your argument. Thank you. Picking up on your discussion, Judge Nelson, we have in the record and it's cited as far as the file of this case that there was a prosecution under 415 when there was no complaint. We show this on page 11 of our brief. There was no complaint, but the police report of the incident, the police report itself became the prosecution for a 415. In other words, the first prong that they say they follow wasn't even there. And they say they only enforce when there's a complaint. There were numerous times when the officers shut down our speech activities when there was no complaint at all. In other words, there was a bone to pick here. I guess. But that procedure, my understanding is that when they shut them down, did they issue a citation in those instances? Because isn't that protocol for when they can cite someone or arrest someone? There was. It's not. It's not the protocol for whether, you know, I understand the argument that you're making, but I want to understand what that protocol is for. So I think it's important if you're saying they didn't follow their protocol, did they actually, you know, was the person cited in violation? You're saying the person was cited. This incident became a prosecution under 415. There was never a complaint done. They violated their own internal policy. What are you talking about? I'm sorry. What? What? Where in the record can I see that? What? Can I go look at what you're talking about? Exhibit 15C and 20D. And then there was an incident report and the police report, which was 20E. And we show this in the transcript of pages 918, line 5 through page 929. There was a discussion with the transcript record as well. The point is this, and I would want to sum up if I could. Enforcement and granting of permits was all over the map, Your Honor. It was here. It was there. It was just whatever they decided to do at the moment. And then later on, they would make up some reason why they would do some enforcement activity or what would justify it. But in the record itself shows that many times they enforced these regulations when there was never a complaint. There was no complaint. And they said, you've got to shut down. And then they would cite them. They would take their equipment away. No one was treated the way these people were treated. And yes, the police have a record with them. Captain Martel made a statement that he would never give them another permit over his dead body. Or he said something, I'll be damned if you ever get another permit. They definitely limited their speech activity. And under the California Constitution, I really want to just sum this last point up. How can it possibly be reasonable or rational in any way, shape or form to say that one group can stay there and continue their activity and one group cannot when the standard there is whether you're interfering with the forum? Go ahead and take those groups out. But don't just let one stay and then take the other one out as happened again and again and again with these people. It's just not fair, Your Honor. Thank you for your argument. This matter will stand submitted at this time. Thank you.
judges: T.G. Nelson, Gould, Callahan